5   649
30   371
31  _287

## DAVE DRAKE *v.* THE STATE.

1. JURY — SPECIAL VENIRE. — Under the law regulating the organization of juries in capital cases, the defendant is entitled to be served with a list only of the persons summoned whose names appear on the writ of special *venire*.

2. SAME — CASE STATED. — It is shown by the bill of exceptions that eight jurors had been empanelled out of the original special *venire*, when it was exhausted, and a new *venire* ordered. When the return was made, and the names on this second *venire* were called, the defendant claimed the right to challenge and strike out from the eight jurors empanelled from the first *venire;* which the court refused to permit him to do. *Held*, that after the eight jurors had been properly empanelled, neither party had the right to peremptorily challenge any of the eight, and that the court did not err in refusing to permit such challenge.

3. ORGANIZATION OF JURIES. — In the organization of juries in capital cases, section 22 of the jury law of 1876 does not apply.

4. SAME — PRACTICE. — In the organization of a jury to try a capital case, the names of the persons summoned must be called in the order in which they appear upon the list, and when found qualified, they are to be challenged peremptorily or for cause, or accepted severally, as each one is determined to be qualified by the court; which is to be continued until the jury is completed.

5. SAME. — When a juror is thus accepted, it is not within the power of either party to challenge him peremptorily, whether the jury is full or not.

6. SAME. — There may be, however, discretion in the court to excuse or stand aside a juror, after he has been accepted, for good cause shown at the time why the juror should not serve.

7. EVIDENCE. — The court did not err, in a trial for murder, in excluding evidence for the defence going to show that the deceased had made threats against the brother of defendant.

8. CHARGE OF THE COURT. — See the opinion for statement of facts in a trial for murder, and for a charge thereupon, which is *held* to be correct on the law of manslaughter and self-defence.

9. SAME. — There being no evidence tending in the remotest degree to show that the deceased was armed when the defendant shot him, it would have been error had the court charged, as asked, that if the jury believed that the deceased was armed at that time, and conducted himself in such manner as to lead a reasonable man to believe he intended to use such arms against the defendant, they should acquit.

10. CONTINUANCE. — The fact that an absent witness, desired by the defendant, had been duly subpœned by the State did not dispense with such diligence as would entitle the defendant to a continuance.

11. NEW TRIAL — CASE STATED. — A new trial was asked upon the affidavit of two persons, setting forth that one of the jurors was incompetent because of defective hearing and deficient understanding of the English language. An affidavit of the defendant disclaimed knowledge of this incompetency until after the trial. The explanation of the court below shows that the juror, before being placed upon the jury, was subjected to the usual examination. *Held*, that the motion for a new trial was properly overruled.

12. PENALTY. — A life-term in the penitentiary does not transcend the legal punishment prescribed for murder in the second degree.

APPEAL from the Criminal District Court of Galveston. Tried below before the Hon. G. COOK.

The appellant was charged by indictment with the murder of Henry Snowball, by shooting him with a pistol, in the county of Galveston, on March 4, 1878. The jury found him guilty of murder in the second degree, and assessed his punishment at confinement in the penitentiary during his natural life. A lucid statement of all material facts will be found in the opinion of the court.

*B. R. A. Scott*, for the appellant.   1. On the first point, it appears that as many as thirteen of the special *venire* first ordered were returned not found, and only eight of the jurors who tried the case could be empanelled out of it. Not until this *venire* was exhausted was a new *venire* ordered by the court, from which the jury was finally completed.

The defendant here desired to challenge peremptorily among the eight, as well as the new *venire* to be selected from ; which was denied him.

We submit that the *venire* should have been filled before

proceeding to empanel the jury (Pasc. Dig., art. 3030; Laws 1876, p. 83, ch. 76, sec. 23), and that the defendant had the right to challenge peremptorily among the eight first taken, upon cause (Laws 1876, p. 28, ch. 76, sec. 22,), and even after they were accepted and empanelled. *Hubotter* v. *The State*, 32 Texas, 843. For otherwise he would be led to exhaust his challenges on a partial *venire* in the first instance, and, in the second place, be forced to challenge peremptorily before the jury are examined for cause, contrary to section 22, above referred to, and be denied the right to set aside by peremptory challenge a juror he might distrust personally, even after having accepted him ; which privilege was granted the State in the case above named.

2. The second point of objection, so far as we have read, is a new one, and founded mainly in reason and justice.

The State attempted to make out a case of murder in the first degree, by showing malice in defendant's arming himself with a deadly weapon before starting to Snowball's house. Defendant, after showing resentment and anger towards Holmes on the part of deceased, a quick-tempered, large, able-bodied man, carrying arms about him, and that he (defendant) occupied his brother's place temporarily, as Holmes's manager, proposed to show, in excuse for arming himself, that deceased had made dangerous threats against his brother, Tom Drake, as Holmes's manager (and presumably against defendant himself, or any one connected with Holmes). There is no doubt but if Tom Drake had been on trial, this evidence should have been admitted. Whart. Cr. Law, 3d ed., 296, and references. And the only question remains, whether the *reason of this law* fairly applied to defendant's case. We submit that it does; for, standing in his brother's place in all respects, as between Holmes and deceased, subject to the same feelings of resentment from deceased as his brother could have

deserved, and knowing deceased's disposition and danger-
ous character, defendant had the right to anticipate violence
in demanding. Holmes's horse from Snowball, and on the
trial to show every excuse he could for arming himself, to
rebut the unfavorable presumption arising from such prep-
aration. Nor does the fact that defendant was acquitted
of murder in the first degree cure this error; for, being
tried for that offence, the jury, on the evidence allowed to
defendant, found a less penalty, and if this evidence had
been admitted, might have found still more in his favor.

3.. The court erred in not granting the continuance asked
by defendant.. We submit that the motion met the require-
ments of the statute substantially (Pasc. Dig., arts. 2907,
2987), and that the evidence, under the aspect of the
case,. after the State had proved that defendant armed him-
self and said he was going to get the mare, became material'
as part of the *res gestæ*, to show defendant's avowal of none
but peaceable intentions in going to Snowball's house,
though *advised* to prepare for a difficulty.

True, the witness Reymond was subpœnaed by the State;
but, inasmuch as if he had attended, the defendant would
have been entitled to a recognizance for his testimony
(Pasc. Dig., art. 2915), the fact of the district attorney
waiving his attendance (for reasons of his own) should not
have obliged defendant to have used the extreme caution of
summoning a witness purely to rebut evidence that he could
not know, until the day of trial, would be produced. It
operated as a surprise, therefore, and defendant should
have had a new trial, after the continuance was refused.

4 and 5. The charge of the court dwells upon murder as if
that were actually committed, and fails to define the law of
manslaughter *fully*, as the evidence called for. Only the
first cause, for anger, rage, etc., under article 2554, Paschal's
Digest, was given by the court, when, under the evidence
of deceased's personal strength and the use of weapons upon

defendant, the court should have given the second cause stated in the statute, also giving the defendant the benefit of a doubt whether the first shot inflicted the mortal wound, or even whether that were not fired accidentally, in taking out the pistol, in his excitement. There was no evidence of deliberate aim.

· The court should also have given defendant the benefit of apprehension from deceased's wearing small arms (as a derringer) upon his person, and of the previous threats and passionate disposition of deceased, as circumstances disproving malice.

6. The court erred in not granting a new trial on account of the incompetency of the juror H. F. Hansen, who was both deaf and unacquainted with the English language.

This juror was one of the first empanelled, among whom defendant desired to challenge peremptorily.

His incompetence may be regarded as established from the affidavits appended to the motion, as well as unknown to the defendant at the time of the trial. And the explanation of the judge is both impertinent to the matter of the exceptions, referring, as it does, to matter *dehors* the record in this case, and comparatively unreliable.

The defendant went to trial without a hint of this juror's double infirmity, and now asks this court if it is competent for a judge to pass finally upon the qualifications of jurors at large in a culprit's absence, and not allow him to question or countervail such private opinion afterwards. *Hanks* v. *The State*, 21 Texas, 527; Pasc. Dig., art. 3040.

7. Finally, we submit that the sentence is too severe for the crime proven, and shows a bias against the accused in the minds of the jury; not calculated to be diminished, either, by the rulings on the trial. Truly, a life of imprisonment lets little more hope through it than the dread sentence of death itself. Both *freeholds of darkness*, " of indeterminate

duration." . Fifty, seventy-five, or even a hundred years were better than the shutting out of every prospect that makes life endurable.

If fairly tried and legally convicted of a crime deducible from the whole admissible evidence, the defendant would naturally expect the vindication of the law upon his liberty to some certain extent, and could not complain, but in view of the errors of trial against him, "his punishment is greater than he can bear."

*Thomas Ball*, Assistant Attorney-General, for the State.

Ector, P. J.   The defendant, Dave Drake, was indicted at the March term, 1878, of the Criminal District Court of Galveston County, for the murder of one Henry Snowball. He was tried at the May term, 1878, of said court, convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for the term of his natural life.

The defendant appealed to this court, and has assigned a number of errors committed by the court below on the trial, for which he insists that the judgment rendered herein must be reversed.

The first point urged in his behalf is, that "the court erred in not having the *venire* completed before compelling the defendant to begin the selection of a jury, as such ruling prevented him from having a full *venire* to select from." It appears from the record that the court below ordered the sheriff to summon sixty men, whose names were given in the writ of special *venire facias*, to be and appear before the Criminal District Court of Galveston on the day set for the trial of this cause, out of whom to select a jury. No exception is taken to the manner in which the names of the sixty persons in said *venire facias* were obtained. The sheriff executed said writ, as shown by his return, by summoning

all the persons named except thirteen, who could not be found.  On the day set for the trial, when the case was called, the persons who had been summoned on the special *venire* were called for the purpose of empanelling a jury, and no objection was made on the part of the defendant that he did not have a full *venire* of sixty men to select from, or that he had not been served with a list of the persons summoned upon said special *venire*.  This court has held that, under the law now in force in this State for organizing juries in capital cases, a defendant is only entitled to be served with a list of the persons summoned whose names appear on the writ of special *venire*.  It is not pretended that this right was not accorded to the defendant.  *Harrison* v. *The State*, 3 Texas Ct. App. 558.

The second point is, that "the court erred in not allowing the defendant to strike from the *venire* first ordered, after a second *venire* had been ordered, because the defendant was entitled to twenty peremptory challenges, and the ruling of the court prevented the exercise of that right, and compelled him to stand a trial before men whom he would have challenged, when he yet had the right to peremptory challenge, said right of challenge being demanded before the jury had been empanelled or sworn."  There is a bill of exceptions in the record, taken by the defendant, which recites the following facts : Eight jurors had been empanelled out of the original special *venire* when it was exhausted, and a new *venire* was ordered ; and when the return thereof was made, and when the persons on this second *venire* were called, the defendant by his counsel claimed the right to challenge and strike from the eight empanelled out of the original *venire*, as well as from the new *venire;* which the court would not allow him to do.  After both parties had accepted the eight jurors, and they had been empanelled, neither party could challenge peremptorily among the eight.

Our Code of Criminal Procedure provides as follows:

"Art. 3016 (Pasc. Dig.). When there is pending in any District Court a criminal action for a capital offence, the district attorney may, at any time after indictment found, on motion, obtain an order for summoning any number of persons, not less than thirty-six nor more than sixty, as may be deemed advisable, from whom the jury for the trial of such capital case is to be selected."

"Art. 3024. In forming the jury, the names of the persons shall be called in the order they stand upon the list; and if present, shall be tried as to their qualifications, and, unless challenged, shall be empanelled."

Section 22 of chapter 76, page 82, of General Laws of 1876 does not apply, as is contended for by counsel for defendant, in the organization of juries in capital felonies. Both our Supreme Court and this court have passed upon the exact question raised in this assignment. The Supreme Court, in the case of *Horbach* v. *The State*, 43 Texas, 260, held that, in empanelling a jury in a capital case, the names of the persons summoned should be called in the order they stand upon the list, and when found qualified they are to be challenged, either peremptorily or for cause, or accepted severally, as each one is determined by the court to be a qualified juror; which is to be continued, one by one, until the jury is fully formed, to the number of twelve. And the court say: "We know of no law, or established practice under the law, which sanctions the peremptory challenge of a juror by either party when thus placed on the jury, whether it is full or not. There may be discretion in the court for excusing or standing aside a juror after he is thus selected, for some good cause, shown at the time, why the juror cannot or ought not to serve on the jury."

And this court, in the case of *Baker* v. *The State*, 3 Texas Ct. App. 532, in construing said article 3024, said: "This clearly indicates that each person is to be examined

separately, and subject to challenge, either for cause or per-
emptorily, separately, and that these things are to be done
before the person is empanelled; and that to challenge
afterwards would not be allowed, except for cause not dis-
coverable on the examination of the person, and set out in
the application for leave to challenge.'' The judgment of
the District Court in each of the above cited cases was
reversed because peremptory challenges were allowed to
jurors after they had been empanelled as jurors.

The fourth assignment is, that '' the court erred in refus-
ing to allow the defendant to prove threats against T. F.
Drake, the brother of the defendant and the manager of the
Holmes place, when it had already been shown that T. F.
Drake had gone to the city of Galveston and left the
defendant in charge of said place, because the defendant
was thereby placed in the capacity of his brother, and sub-
ject to the same orders of his principal which had offended
the accused, and about which orders the difficulty oc-
curred.'' We know of no rule of evidence under which
threats by deceased against T. F. Drake would be admissi-
ble on the part of Dave Drake, in his justification for killing
the deceased. The bill of exceptions taken to the rulings
of the court in refusing to permit the witness Matthews to
prove threats against T. F. Drake by the deceased does
not state what the threats were which defendant desired to
prove, or that there were any threats made by deceased to
to take the life of T. F. Drake.

The next assignments of error relate to the charge of the
court. In order to a proper understanding of these points,
it will be necessary to give the substance of the testimony
as it appears by the statement of facts.

The deceased and defendant resided in Galveston County.
The occupation of deceased was that of a nurseryman. T.
F. Drake, or Tom Drake, as he is generally called by the
witnesses, was in the charge of the Holmes place, and

Dave Drake, the defendant, stayed with him on the place. The deceased lived about one and a-half miles from the Holmes place.· Holmes lived in the city of Galveston, and sold flowers and shrubbery for the deceased.   On the day of the killing, T. F. Drake had gone into the · city and left Dave Drake in charge of the Holmes place, with orders not ·to permit anything to go off of the premises without a written order from Mr. Holmes.

Blount, a colored boy living on the Holmes place, was sent by the defendant on one of Holmes's horses (a mare) to the Perkins place, which adjoined the premises of the deceased, for some oats with which to feed the horses on the Holmes place.   Snowball took the mare from Blount. The boy Blount returned home on foot, and informed the defendant that Snowball had taken the mare from him. Defendant then went to the head of the bed, in another room, got his pistol, buckled it on him, and said he would go over and get the mare.

Joseph Snowball, a son of the deceased, testified that " on the 4th of March, A. D. 1878, my father, Henry Snowball, had been out in his garden working.   He went in and got dinner, and was sitting on the steps of his house, and had been sitting there about a quarter of an hour, when defendant, Drake, came in and said to Henry Snowball : ' By G—d, Snowball, what are you about? '   Snowball replied, ' I know what I am about, and I am responsible for what I have done.'   Dave Drake then commenced cursing him, and called him a G—d d—d s—n of a b—h.   My father told him he must not curse him .in that way on his own premises, and that if he would go out of the gate he would talk to him, but that he would not be sworn at in any such way on his own premises.   Drake continued to curse and abuse him. · My father told him to go off his premises several times, but he would not go.   My father then pushed him, by putting his open hand on Dave Drake, and had

pushed him about half-way from the house to the gate when Dave Drake drew a pistol, a six-shooter, from under his coat, and shot my father, Henry Snowball. The ball entered his left side, passed through his body and right arm. I saw him (Snowball) put his hand up to his side. I also saw the blood. My father then started for the house, and Dave Drake again shot at him. * * * My father got his shot-gun, that was in the house, and came out. Defendant, Dave Drake, was behind the stable, and shot two other shots at my father, and one at me. My father then shot Dave Drake in the hand. * * * My father then became weak, and began to stagger, and I took him into the house. He died on the next day, about ten o'clock; he died of the wound received from Dave Drake; he had no weapon of any kind on him. * * * My father, the day before, had taken from a negro boy one of Mr. Holmes's horses, and brought him home, and intended to write to Mr. Holmes about it the day he was shot. Several of Mr. Holmes's horses had died, and they were abusing this one, and father took him to take care of him for Mr. Holmes."

Mrs. Snowball was also sworn, as a witness for the State, and testified that she " was wife of the deceased. Was present when deceased was shot; he was in his own yard. Saw Drake, who was using abusive language to deceased, who said he would not be cursed in his own yard. Saw Drake draw his pistol and shoot deceased. The first shot took effect; the second shot passed into the house. Deceased got his gun, after being shot, and shot one time at Drake, who continued to shoot at deceased. * * * Deceased first put his hand on Drake's shoulder and pushed him, when Drake shot him. Deceased had a pistol in his house, but did not have any arms of any kind on his person when he was shot."

Mrs. Nettie Perkins, a witness for the defence, testified that she " heard bad language, and heard deceased tell Drake that he must not use such language. Drake said he

wanted to talk reasonably. Deceased pushed Drake about
half-way to the gate; was pushing him with his open hands,
from behind, when Drake turned round and said, 'Mind
what you are about.' Deceased then threw out both his
hands against defendant's breast; his fists were clenched,
but I do not know whether it was a push or a strike, and
afterwards pushed him with his double fist, but do not know
whether he intended to strike him or not. Drake then drew
his pistol and fired. When the shot was fired, she saw the
deceased put his hand on his side. Was under the impres-
sion that it was Drake that was using the bad language.
She was too much excited to pay much attention to what
was said. * * * Mrs. Snowball was nearer to the par-
ties than she was. Deceased got his gun, as did young
Snowball, after Drake had twice shot at the deceased.''

Sam Perkins, also a witness for the defence, testified
that the " deceased was a rather large man; was quick-
tempered.''

It is insisted on the part of the defence that the court, in
its charge to the jury, failed to instruct the jury on the differ-
ent degrees of homicide; that the jury, under the charge,
was compelled to find the defendant guilty of murder either
in the first or second degree; that the charge of the court
did not fully define the law of manslaughter, to which grade
of homicide the evidence was sufficient to reduce the offence;
that the charge of the court directed the minds of the jury
to the evidence, as established facts, that the defendant had
causelessly intruded upon the premises of the deceased, and
that the deceased had been killed while in defence of his
own property. A careful examination of the charge of the
court has satisfied us that the objections made by the defend-
ant to the charge of the court are not well taken. The
court, in its instructions to the jury, properly defined the law
of murder, giving the jury the legal meaning of the terms
" malice aforethought,'' and " express '' and " *implied*

*malice,*'' as used in the statute. It also defined the law of manslaughter. We make the following extracts from the charge of the court:

"Manslaughter is voluntary homicide, committed under the immediate influence of sudden passion, arising from an adequate cause, but neither justified nor excused by law. An assault and battery causing pain or bloodshed would be an adequate cause, and if it actually produced the sudden passion of anger, rage, resentment, or terror, under the immediate influence of which the person assaulted acts, while it does not justify nor excuse, it reduces the offence to manslaughter, if, upon the facts, otherwise the homicide would be murder." * * * Again, the court instructed the jury : " If you believe from the evidence that the defendant, without malice aforethought, or the purpose to provoke a difficulty and conflict with Snowball, went to his house to see him upon a matter of business, and hot words ensued between them, and Snowball, without justification, struck defendant a blow, causing him pain, and producing sudden passion, or anger, rage, resentment, or terror, under the immediate influence of which he shot and killed Snowball with a pistol, and that the pistol was a deadly weapon, you will find the defendant guilty of manslaughter, and assess his punishment to confinement in the penitentiary not less than two nor more than five years." " Every man has the right to defend himself against attack threatening him with serious bodily harm or death, and is presumed to be innocent until his guilt is established by the evidence to the satisfaction of the jury, beyond reasonable doubt ; and unless you are so satisfied by the evidence in this cause, you will say by your verdict that you find the defendant not guilty."

The law of the case was distinctly set forth in the charge. The charge did not force the jury to any particular conclusion. On the contrary, it is not objectionable as a charge upon the weight of the evidence ; nor does it intimate that

defendant had causelessly entered upon the premises of Snowball, and killed him while in the defence of his own property. The court instructed the jury that "the defend-ant had a right to go peaceably to Snowball and demand the horse, and reclaim it, if he could do so without a breach of the peace, but not otherwise." The court properly instructed the jury that a man had a right to control his own home. If another comes upon his premises, and in the presence of his family uses vulgar, indecent, profane, and insulting language, he has the right to put such other person off of his premises by the use of force, such as will reason-ably accomplish the purpose. The use of such force as will accomplish the purpose must be exercised and regulated by the amount of refusal and resistance. If he requires such other person to go, and he refuses, the owner of the premises has the right to reasonably increase the force until it overcomes resistance and accomplishes the purpose. The charge of the court correctly explained to the jury the rights of the owner of the premises under a certain state of facts, without intimating an opinion as to whether or not such facts were proved in the case at bar. A charge of the court which calls particular attention to the facts relied on by the parties, and indicates the law upon such facts, is proper. The principles of law were fully explained to the jury, and the jury were left free in the discharge of their duties as judges of the facts.

The court, we think, properly refused to give the instruc-tions asked by the defendant, because they either do not state the law or are not applicable to the facts.

The first instruction asked by the defendant is as follows: "If you believe from the evidence that the defendant had cause to believe that the deceased was armed, and that his actions were such as to lead a reasonable man to believe that deceased intended to use such arms, or to kill defendant, your verdict must be an acquittal of defendant." There is

no evidence in the case tending to show, even remotely, that the deceased was armed at the time he received the fatal shot, or that his actions were such as to induce a reasonable man to believe that he was armed, and intended to use such arms upon the defendant.    The circumstances surrounding the defendant at the time of the shooting were not such as to impress his mind with a reasonable belief that Snowball was about to take his life, or do him some serious bodily harm. The proof shows that deceased was unarmed when he was killed.

The court properly overruled defendant's application for continuance.    The application showed no diligence whatever on the part of the defendant to procure the attendance of the absent witness at the trial.    The continuance was asked for in order to procure the testimony of James Reymond, who resides in Galveston County, Texas.    The fact that Reymond had been subpœnaed as a witness in behalf of the State affords no legal excuse for the failure of the defendant to take any steps whatever to procure the testimony of said witness.

The twelfth assignment is, that " the court erred in refusing to grant a new trial because of the incapacity of H. F. Hansen to serve as a juror."    One of the grounds set out in defendant's motion for new trial is, " that the defendant did not have a fair and impartial trial, in this : that one of the jurors before whom he was tried was, by reason of imperfectly understanding the English language, and for the further reason of his being of very poor hearing, incompetent and incapable as a juror, and defendant refers to exhibit A, hereto attached and made part hereof :

" Exhibit A.    The State of Texas, county of Galveston : Before me, M. H. Royston, clerk of the Criminal District Court of Galveston County, personally appeared Sydney B. Swift and Robert McNeely, who, after being duly sworn, depose and say that H. F. Hansen, one of the jurors before

whom the cause of *The State of Texas* v. *Dave Drake* was tried, was incompetent as a juror, because he was of imperfect hearing, and did not understand the English language ; because of which he was unable to properly understand the testimony.

[Signed]                              " Robert McNeely,

" S. B. Swift."

" The defendant in the above cause being sworn, deposes and says that the above facts were unknown to him until after the trial of said cause.

"D. S. Drake."

Exhibit A was duly attested by the officer before whom it was sworn to and subscribed.

The defendant's motion for a new trial was overruled, to which ruling of the court the defendant took a bill of exceptions. The court, before signing the bill of exceptions, added the following explanation : " That the juror H. F. Hansen, who was originally sworn as a juror of the regular panel, was examined and tested by the court as to his ability to hear the testimony and understand the language of the witnesses, and the court was entirely satisfied as to his ability, and having been in this case submitted to the usual examination prescribed by law, no objection being made to him, he was accepted, empanelled, and sworn as a juror." The defendant's counsel insists that the incompetency of the juror Hansen was established by the affidavits to the motion for new trial, and that defendant went to trial without any knowledge of Hansen's double infirmity.

We have already in this opinion stated the manner of organizing a jury in a capital case. The judge who presided at the trial states that this juror was submitted to the usual examination prescribed by law. If the jury were severally examined,—as, in the absence of showing in the record to the contrary, we must presume was the case,—it does seem to us almost impossible that both the court and counsel engaged

in the cause should have failed to notice any defect of hearing, and of understanding of the English language on the part of Hansen, if any material defects of the kind really existed.    We believe that the explanation of the judge who presided at the trial, made before signing the bill of exceptions, should outweigh the affidavits of the witnesses McNeely and Swift, which are attached to defendant's motion for new trial, and that the court below did not err in overruling the motion.

The verdict of the jury is abundantly supported by the law and the evidence.

It is submitted on the part of the defendant that the judgment is too severe a punishment for the crime proven.    It cannot be said that the jury, after finding the defendant guilty of murder in the second degree, in assessing the punishment exceeded the limits affixed by the statute to the offence.    Our Criminal Code provides that " the punishment of murder in the second degree shall be confinement in the penitentiary for not less than five years."    Pasc. Dig., art. 2271.

The defendant has had a fair trial, and has been ably defended, and legally convicted.

The judgment of the Criminal District Court is, therefore, affirmed.

*Affirmed.*